# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

LAWRENCE J. CHASTANG,
DORA PATRICIA CHASTANG,
LAWRENCE CHASTANG, JR.,
MILES CHRISTIAN CHASTANG,
ADRIANA PATRICIA CHASTANG, AND
WINSTON CHASTANG,

    Plaintiffs,

v.                                        CASE NO.: 6:17-cv-00538-Orl-37DCI

GILAD LEVY, in his individual capacity
and in his capacity as a Deputy Sheriff for
the Orange County Sheriff's Department,

    Defendant.
_____/

## EXPERT AFFIDAVIT OF KENNETH R. WALLENTINE

1.    My name is Kenneth R. Wallentine. My address is 5272 S. College Drive, Suite 200, Murray, Utah 84123. I was requested by the attorneys for the Defendant in the above-styled case to review the conduct of Orange County Sheriff Deputy Gilad Levy at issue in Plaintiffs' Amended Complaint.

2.    My professional law enforcement career spans 36 years. I am a law enforcement officer in the State of Utah, currently serving as a Supervisory Special Agent for the Utah Attorney General. I became certified as a law enforcement officer in the State of Utah in 1982. Until April 1, 2014, I was employed with the Utah Attorney General, where I served as the Chief of Law Enforcement. I was formerly employed as Bureau Chief at the Utah Department of Public Safety Peace Officer Standards and Training ("POST") Division where, among other responsibilities I supervised in-service training and administration and certification for all peace

EXHIBIT M

officers in the State of Utah. I also supervised the Police Service Dog Training and Certification Program for the State of Utah.

3. I was formerly responsible for providing delivery of the basic training curriculum relating to all legal subjects, as well as certain tactical subjects at the Utah Law Enforcement Academy. I continue to teach at the Utah Law Enforcement Academy and I am the author of the police academy curriculum currently in use for several subjects including but not limited to use of force, reasonable force, use of force in police service dog teams, search and seizure, search and seizure for police service dog teams and use of force/firearms instructor liability. I regularly teach the basic training programs at the Utah State Police Academy. I regularly teach in the following specialized courses: Firearms Instructor Course, Utah Sheriff's Association Command College, First Line Supervisor Course, POST K9 Unit Administrator Course, POST Patrol Dog Handler Course, POST Narcotic Detector Dog Course, and others. I am a former police service dog handler and worked with the Uintah County Sheriff's K9 Unit from 1995 to 2001. I continue to provide instruction and evaluation services for POST police service dog program.

4. I am a certified POST Firearms Instructor, often serving as a lead instructor for POST Firearms courses. I am a certified TASER® Instructor.

5. I am a licensed attorney and have practiced law since 1990. I am admitted to practice before the United States Supreme Court, the Courts of Appeal for the Fifth and Tenth Circuits, and State and Federal Courts in the State of Utah.

6. In addition, in my primary employment, I occasionally consult and provide expert witness opinions on police procedures, canine handling and use of force issues. I am the co-founder of, and legal advisor to, a best practices advisory group that developed comprehensive model policies and best practices under the authority of the Utah Chiefs of Police Association,

the Utah Sheriff's Association and various state law enforcement agencies. I have served as a contract consultant to the United States Department of Justice, assigned to provide technical assistance and management consulting to various public safety entities in the United States.

7. I am a former member of the Scientific Working Group on dog and orthogonal detector guidelines, a national scientific best practices organization sponsored by the Federal Bureau of Investigation, the Department of Homeland Security, and the Transportation Security Administration, with support coordinated by the International Forensic Research Institute at Florida International University.

8. Since 1994, I have been a consultant with Canine Academy for law enforcement in the International Police Canine Conference. My principal responsibilities are to provide use of force training, civil liability instruction, search, and search and seizure instruction. I have provided police service dog training and service certification standards, consultation for two police service dog organizations including a western regional group and one of the major national groups.

9. I have personally been involved in the testing of oleoresin capsicum or "Pepper Spray" effectiveness to subdue and fend off large aggressive dogs in several controlled experiments. Based on these controlled tests the canine handlers concluded that oleoresin capsicum was ineffectual at subduing large aggressive dogs. In certain tests the use of oleoresin capsicum provoked the dog to fight the human subject even more intensely.

10. In a second test environment, a dog was sent to apprehend a human subject (the person was equipped with a gas mask and a bite sleeve saturated with oleoresin capsicum). Once the dog bit the human subject, the subject sprayed the dog directly and extensively in the face with oleoresin capsicum aerosol. This dog had never previously been exposed to any pepper

spray product. Initially, the dog bit deeply and firmly. Upon repeated application of pepper spray, the dog closed its eyes and bit and fought the human subject even more intensely. The subject sprayed the dog repeatedly, directly on the nose and in the eyes. Nearly half the canister was delivered before the dog was removed by its handler. The dog never voluntarily released his powerful bite. The dog received numerous direct pepper spray shots in the eyes and nose during the apprehensions, and still the dog continued to bite ferociously. It was apparent to all observers that the dog had experienced major discomfort, but with the eyes shut tightly, the dog increased its bite pressure in pulling and tearing.

11. The opinions stated in this Affidavit are based on my 36 years of professional law enforcement and canine handling experience. I am knowledgeable as to the efficacy and limitations of standard police tools, including electronic control device such as a TASER® and chemical agents such as oleoresin capsicum.

12. I have been retained as an expert witness in this case for the defense. On November 1, 2017, I furnished a written report pursuant to Federal Rule of Civil Procedure 26.2(b). In my report, I provided a complete statement of my opinions with their basis and reasons; pertinent facts and data considered by me in formulating my opinions; an overview of my qualifications, including a list of publications offered by me in the previous ten years; a list of all cases during the last four years where I testified either as an expert at trial or deposition, along with a statement of compensation paid for the study and testimony rendered in this case.

13. Among my most recent and pertinent publications are *The K9 Officer's Legal Handbook,* Second Edition, published by Lexis/Nexus Matthew Bender, in February 2014 with a 2015 supplement published in February 2015, and a 2002 supplement published in 2017; *Targeting TASER: The New TASER Aim Points*, Law Officer, January 2010; *Explosive Detector*

*Dog Legal Issues*, K9 Cop February 2009; and *Does Police Service Dog Employment Equal Deadly Force?*, K9 Cop, April 2009.

14. I have previously been qualified in courts of competent jurisdiction as an expert in the subject matter of police procedures, including use of TASER® devices, excessive force, police shootings and wrongful death claims and police services dog use. I have never had a court decline to find that I am a qualified expert witness.

15. The opinions expressed in this Affidavit are based on my knowledge, experience and training in the field of law enforcement. They are also based upon my review of:

- Orange County Sheriff's Office Incident and Supplemental Reports dated July 2, 2016;
- Body worn camera recording from Deputy Gilad Levy;
- Plaintiffs' Amended Complaint;
- Computer/Dispatch call;
- Audio recording of the alarm company;
- Audio recording of radio traffic;
- Orange County Animal Control Services reports; and
- Deposition testimony of Gilad Levy taken on October 18, 2017.

16. In my written expert report of November 1, 2017 ("expert report") I stated:

There were signs placed low to the ground at the [Chastang] residence that suggested the presence of dogs. However, two of the signs were camouflaged by vegetation or obscured by a parked boat. Assuming that one could see a notice or sign, a reasonable and well-trained officer would not tailor the burglar alarm response to the suggestion posted by the signs. One of the least tactically sensible and indeed, one of the worst possible and most unreasonable options for response to a residential burglar intrusion alarm would be to drive directly up to the residence, sound the car horn and remain in the vehicle.

5

17. In my expert report, I addressed the tactical training that law enforcement officers receive in responding to residential burglar alarms. I stated:

> Officers generally respond to residential burglar alarms as a high priority call. A residential alarm may actuallybe signaling a home invasion and robbery and/or a resident's activation of a panic alarm. Officers are trained that a residential burglary can quickly and unpredictably turn into a barricaded hostage situation. On the other hand, a power outage or human error may cause the alarm. Until the officers on the scene can investigate the circumstances, they are obliged to prepare for the worst.

18. In my expert report, I expressed my opinion that:

> Deputy Levy reasonably assessed the dogs' actions as potentially causing serious bodily injury or death to him. As Deputy Levy backed away, the Labrador ran toward him. The body posture of the dog as he neared Deputy Levy and began to dart back and forth in a narrowing arc was aggressive. He could hear the dogs growling and barking loudly. The first dog to run toward him (the Labrador) was running at fast speed. The ears were full back; the tail was lowered. The mouth was open and teeth were visible. A reasonable and well-trained police officer may not be trained or familiar with common canine body language indications of aggression and/or fear. Notwithstanding, a reasonable officer could perceive the dog's body language as threatening or at perhaps ambiguous, but certainly not friendly and affectionate.

19. In my expert report, I stated that based on my extensive experience with canines, canine handling and training, I am aware that:

> Labrador dogs are responsible for a fairly high percentage of reported dog bites, and that Rottweilers are also known for particularly powerful bite strength. Though not particularly common, even Labradors have been responsible for several fatal bites over the past few years. Reports of deaths inflicted by Rottweilers are also known.

20. In my expert report, I stated that law enforcement officers typically carry non-lethal defensive tools, "such as an electronic control device (generally a TASER® device) and/or

aerosol oleoresin chemical (pepper spray)." I expressed my opinion that neither of these tools offered a practical and reasonable option for Deputy Levy under the circumstances that he faced.

21. In my expert report I opined:

> Attempting to strike the Labrador with a TASER probe deployment was not a reasonable option. A TASER fired in probe mode is only effective when both probes impact and remain in a body, optimally in a major muscle group. To be effective in creating neuromuscular incapacitation, the probes must be separated in distance. For that reason, the ideal targeting distance for a person is no less than seven feet away. The targeting system and target acquisition procedure for a TASER device is different than targeting with a handgun. The TASER is drawn and directed with the less dexterous weak hand. Targeting involves activating a switch to power a laser targeting beam, aligning the beam with the intended path of the top probe an estimating (depending on distance) the path of the lower probe. Targeting a TASER device requires more time than instinctive targeting with a handgun. The much smaller presented profile of a dog moving rapidly prevents a very challenging target. It is uncommon for an officer to successfully strike a dog with both probes of a TASER and to achieve neuromuscular incapacitation. That is especially true for a dog charging directly at the officer.

22. In my expert report I stated that a TASER device of the kind used by Deputy Levy was designed to deliver electrical current for five seconds, after which the dog would return to normal muscular function. Electrical current would cause the dog to become hyper-aroused by pain which would be attributed to Deputy Levy. After hyper-arousing and agitating the Labrador, Deputy Levy would also be facing two Rottweilers with no TASER option remaining.

23. In my expert report I stated:

> ...I am aware of no testing of TASER devices to determine safe use for dogs. The official position of the American Veterinarian Medical Association discourages the use of electro-muscular disruption devices, such as the TASER, on animals and opines that they are not demonstrated to be safe for such use.

24. In my expert report I opined that:

7

The use of oleoresin capsicum spray, commonly known as pepper spray, was not a reasonable option for Deputy Levy. The aerosol pepper spray used by patrol officers is best deployed at a distance of no less than four feet and as much as ten feet. The spray is a direct, pressurized stream, not a conical spray. Officers are not trained to spray a person's eyes or nose. Rather, they are trained to direct the stream at the center of the forehead or sweeping across the forehead. Though targeting need not be as precise as a TASER, it is challenging to hit the small area at the center and above a dog's eyes. Pepper spray might be effective on a dog that is standing relatively stationary at some distance and a sustained stream may be fired at the proper target zone...It is extremely difficult to target and deliver a pepper spray stream to a moving dog.

25. In my expert report I opined that:

Under optimal circumstances, pepper spray might be effective on a pet dog. Its effectiveness on an agitated dog is far less probable. I have personally been involved in effectiveness testing of oleoresin capsicum on large dogs in several controlled experiments. In a closed training environment heavily saturated with a 10% oleoresin capsicum aerosol product, a dog similar in size to the three dogs confronting Deputy Levy was sent into the room and his performance was observed by dog trainers. The dog had no difficulty aggressively engaging and repeatedly biting a human subject equipped with a gas mask. The dog showed no outward signs of difficulty in breathing or any sensitivity to the environment. In a second test environment, a dog was sent to apprehend the human subject (the person was equipped with a gas mask and a bite sleeve saturated with oleoresin capsicum). Once the dog bit the human subject, the subject sprayed the dog directly and extensively in the face with oleoresin capsicum aerosol. This dog had never previously been exposed to any pepper spray product. Initially, the dog bit deeply and firmly. Upon repeated application of pepper spray, the dog closed his eyes and bit and fought the human subject even more intensely. The human subject sprayed the dog repeatedly, directly on the nose and in the eyes. Nearly half the canister was delivered before the dog was removed by his handler. The dog never voluntarily released his powerful bite. The dog had received numerous direct pepper spray shots in the eyes and nose areas during the apprehension and still the dog continued to bite ferociously. Though it was apparent to all observers that the dog experiencing major discomfort with eyes shut tightly, the dog increased his bite pressure and pulling and tearing.

26. Based on my professional law enforcement experience, it is extremely common for digital files saved on police body worn cameras to have an initial thirty second audio latency period. In an effort to maximize battery life and data storage, most body worn police camera systems do not start recording audio until the camera is manually activated. However, the camera is constantly recording video in a buffer. The buffered video files are erased and written over automatically every thirty seconds until the camera system is manually activated. Thus, once a body worn camera is activated, video of the thirty seconds prior to activation remains saved and available for viewing without audio.

27. This Affidavit is being executed to attest to the veracity of the foregoing statements and for whatever legal purpose it may serve.

**FURTHER AFFIANT SAYETH NAUGHT.**

March 29, 2018
Date

KENNETH R. WALLENTINE

STATE OF UTAH)

COUNTY OF SALT LAKE)

SWORN TO AND SUBSCRIBED before me this 29th day of March, 2018, by KENNETH R. WALLENTINE, who is personally known to me.

[Notary Seal: LORI OLIVER, Notary Public State of Utah, My Commission Expires on: April 19, 2019, Comm. Number: 681919]

_____
Notary Public

Lori Oliver
Printed Name:

My Commission Expires: April 19, 2018