UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

LAWRENCE J. CHASTANG; DORA
PATRICIA CHASTANG; LAWRENCE
CHASTANG, JR.; MILES CHRISTIAN
CHASTANG; ADRIANA PATRICIA
CHASTANG; WINSTON CHASTANG,

       Plaintiffs,

v.                                     Case No. 6:17-cv-538-Orl-37DCI

GILAD LEVY,

       Defendant.
_____

## ORDER

This case is about a police officer's response to a triggered burglar alarm at a family's home that resulted in the shooting of two pet dogs, one of which died. Plaintiffs are the six members of the Chastang Family who each sue Defendant Gilad Levy ("**Deputy Levy**"), the officer responsible, for damages under 42 U.S.C. § 1983 for violating their Fourth Amendment right against unreasonable seizure. (Doc. 11, ¶¶ 22–27.) Before the Court are Deputy Levy's summary judgment motion (Doc. 20), and Plaintiffs' partial summary judgment motion (Doc. 23). Each side responded (Docs. 24, 25), and the Court now evaluates the matter.

## I.    BACKGROUND[1]

_____

[1] For the purpose of resolving a summary judgment motion, the Court ordinarily presents the facts in the light most favorable to the non-moving party. *See Battle*, 468 F.3d at 759. Here, however, both parties move for summary judgment, and the material

-1-

## A. Chastang Family

The Chastang family consists of six members: father Lawrence, Sr. ("**Lawrence, Sr.**"), mother Dora Patricia ("**Patty**"), eldest child Lawrence, Jr. ("**Lawrence, Jr.**"), second child Miles Christian ("**Christian**"), daughter Adriana Patricia ("**Adriana**"), and youngest child Winston ("**Winston**"). (Docs. 20-3, p. 5:22–24; 20-4, p. 7:1–5.) Lawrence, Jr. is 28, Christian is 26, Adriana is 24, and Winston is 22 or 23. (Docs. 20-2, p. 5; 20-5, p. 9:6; 20-6, p. 5:12; 20-4, p. 7:13.)

The family home is in Winter Garden, Florida. (Doc. 24-1, p. 2, ¶¶ 2–3.) Sitting on a one-acre lot, the property contains the house, a pool, and a detached garage. (Docs. 20-5, p. 53:14–16; 24-1, p. 5.) A long driveway leads up to a large courtyard where numerous vehicles can be parked. (Doc. 24-1, p. 2, ¶ 6.) Before entering the house, at the beginning of the driveway on the right side, this sign is posted:



(Doc. 24-1, p. 2, ¶ 4, p. 7.) At the end of the driveway, on either side of the courtyard, are

---

underlying facts are not in dispute—rather, it is only the inferences drawn from those facts that are in dispute. Therefore, in the following section the Court presents the undisputed facts from the record evidence.

two additional signs:



(*Id.* at 2, ¶ 4; pp. 8, 12.) The "remain safely" sign is on the left; "sound your horn" is on the right. (*Id.*). The home is inside a gated community that requires an access code to enter. (Doc. 20-8, pp. 22:20–25, 23:1–4.)

Lawrence, Sr. and Patty have lived in this home for thirty years. (Doc. 24-1, p. 2, ¶¶ 2–3.) The children grew up there, but all moved away for college. (Doc. 20-4, pp. 6:21–25, 8:8–15.) Since then, they've sporadically stayed at the family home for breaks and visits, or longer stretches between other living arrangements. (*Id.* at 8:8–15.) Currently, Adriana is the only child staying there full-time; Lawrence, Jr. lives in the Cayman Islands; Christian lives at his own home in Oakland, Florida; and Winston, the Chastang still in school, lives by campus in Boca Raton, Florida. (Docs. 20-2, p. 8:5–7; 20-4, p. 8:12–13; 20-6, p. 5:14–15; 20-7, p. 5:14–15.)

### B.    Dogs Growing Up

The Chastangs are dog people. When Lawrence, Jr. was an infant, Lawrence, Sr. and Patty had a Collie named Prince. (Doc. 20-4, pp. 38–39.) But the first family dog was

Sandy, a yellow Labrador the children grew up with. (Doc. 20-3, pp. 6–7.) She passed about ten or eleven years ago of natural causes and the family buried her in a marked site on their land. (*Id.* at 7:3–11; Docs. 20-7, pp. 24–24; 20-2, pp. 16–17.) Around this time, an ATV was stolen from the Chastangs' front yard, so the family decided to get a new dog. (Doc. 20-5, p. 27:2–18.) Christian took the lead in researching dogs and landed on a Rottweiler from a breeder in Gainesville, Florida. (Doc. 20-5, pp. 14–16.) It was selected as "a dog that would be able to roam around in [the] yard – within [the] yard and provide security so that . . . when anybody would walk by [the] home, they would know that there was a big dog on the property and not to come in." (*Id.* at 16:12–17.) At the same time, the family installed an electronic fence along the perimeter of their property and put up the three yard signs. (*Id.* at 28–29.) Perhaps appropriately so, they named the dog Kimbo after a street fighter. (*See id.* at 15–16.) And he's lived up to his billing: he not only has a playful, loving temperament around family and friends, but also a presence and 90-100 pound size that deters those who "weren't welcome." (*See id.* at 18:9–14.) Indeed, since getting Kimbo, nothing "has been taken from [their] property." (*Id.* at 27:14–15.)

Between Sandy and Kimbo, the family rescued another dog "for a short time," who didn't stay with them. (Doc. 20-4, p. 39:19–25.) And after getting Kimbo, the family also got a teacup Yorkie, Teddy, who Adriana picked out for her fourteenth birthday. (Doc. 20-2, pp. 23–24.) Teddy died late summer 2016 after being attacked by two Pitbulls in the neighborhood right outside the Chastang home. (Doc. 20-3, pp. 8–9.)

### C. Acquisition of Bane and Pepper

In 2014, two more dogs entered the Chastang fold. (Docs. 20-4, p. 12:10–12; 20-6,

p. 12:16–18.) Lawrence, Jr. was living in Greenville, South Carolina with his then-girlfriend following his college graduation. (Doc. 20-4, p. 12:17–25.) For his birthday, she gifted him a seven-week old Rottweiler—she knew of his affinity for Kimbo, so selected the same breed for the puppy present. (*Id.* at 10:17–20, 12:10–12; Doc. 20-2, p. 18:7–21.) The pup was a total surprise, and Lawrence, Jr. named it Bane after the Batman character. (Doc. 20-4, pp. 23:2–6, 10:24–25.) Bane was the first dog Lawrence, Jr. owned in his own right, and he considers Bane his dog. (*Id.* at 17:19–23.) As such, Lawrence, Jr. took care of Bane's veterinary needs (*id.* at 17–19) and made the decision to put him in specialized alert and off-leash recall training (*id.* at 23–32).

Wherever Lawrence, Jr. went, Bane went: When Lawrence, Jr. and his then-girlfriend relocated from Greenville to a townhouse in Orlando, Florida, Bane came along. (*Id.* at 13.) Then, around May 2016, Lawrence, Jr. and his girlfriend separated. (*Id.* at 13:21–25.) Taking Bane, he moved out of the townhouse to stay with his parents while he figured out next steps—his move to the Cayman Islands, where he intended to bring Bane, if possible. (*Id.* at 13–14.) While Lawrence, Jr. and Bane stayed at the family home, Patty helped take care of Bane by feeding him and letting him out. (*Id.* at 20–23.) As Lawrence, Jr. trained Bane on the electric fence, he was free to roam the property. (*Id.* at 72–73.)

That same year, Christian got a dog—a black Labrador he named Pepper. (Doc. 20-6, pp. 9–12.) He chose to rescue her during "a lonely year at UCF." (*Id.* at 29:22–25.) The decision was made without involving his family. (*Id.* at 30:8–10.) As he describes it, he "was living in a oneone apartment and no one really wanted to come hang out with

[him] because a oneone apartment's boring, so [he] got the dog and hung out with her."
(*Id.*) He selected her from a rescue facility in Orange County; during his visit, she was
"just brought in." (*Id.* at 11:6–10.) He asked about her, paid a $15 adoption fee, and the
three-month old pup was his. (*Id.* at 11:6–16.) He named her Pepper based on her coloring
and a "laylow" "soft" reggae band that matched her personality. (*Id.* at 11:21–25, 12:1.)
Since adopting her, Christian trained her, got her vaccinated and took care of her
veterinary needs. (*Id.* at 11–13.) He also taught her surfing. (*Id.* at 13.)

After Christian graduated from college in May 2015, he and Pepper stayed at the
family home while looking for his own home to purchase or rent. (*Id.* at 6:13–18, 34–36.)
Since moving to his Oakland home in October 2016, Pepper has a crate in both houses
and shares time between them. (*Id.* at 8:24–25, 9:1–5, 36:1–7.) Even with this shared
situation, Christian considers Pepper his dog as, among the other family dogs, "Pepper's
the one that . . . for the first year and a half of her life . . . spent her time with [him]." (*Id.*
at 6:22–25, 7:1–5.)

### D.    Incident

The summer of 2016, Lawrence, Sr. and Patty had a full house. Lawrence, Jr.,
Christian, and Adriana were staying at the family home, which meant Bane and Pepper
were there, too, along with Kimbo and Teddy. (Doc. 20-2, pp. 8:1–4; 22:13–17, 28:20–25,
29:1–2.)  But leading up to the Fourth of July holiday, the family was scattered: Lawrence,
Sr. and Patty were at the family's condos in Cape Canaveral and Adriana was visiting
her friend in the Bahamas. (*Id.* at 15:19–22; Docs. 20-3, p. 15:20–22; 20-5, p. 38:12–22.)
Winston came up to join his brothers for the holiday, so he, Lawrence, Jr., and Christian

manned the family home. (Doc. 20-7, pp. 11–12.)

On the afternoon of July 2, all of the boys were out, leaving the dogs home alone in their crates. (Docs. 20-7, p. 14:10–14; 20-6, p. 16:2–3; 20-4, p. 53:10–12). Patty's sister, Marianna Trejos ("**Marianna**"), was in town assisting a friend at a gun show and made plans with Patty to stay at the family home. (Doc. 20-11, pp. 8–9.) She arrived there around 5:15 p.m., when no one else was home, and parked her vehicle near the detached garage in the courtyard. (*Id.* at 10:3–19.) As is her habit, she headed to the backyard to tend to the plants and bushes. (*Id.* at 9, 11, 12.) Soon after, she popped into the house to use the restroom—the back door was unlocked, so she let herself in. (*Id.* at 13:8–15.) Opening the door triggered the house alarm, and a continuous beeping noise sounded. (*Id.* at 14–15.) Marianna called her sister for the code, deactivated the alarm, and the noise stopped. (*Id.* at 18.) She then used the restroom and let Kimbo, Bane, and Pepper out of their kennels. (*Id.* at 22:13–16.) They headed out to the backyard, and Marianna returned to trimming bushes back by the family pool. (*Id.* at 22:17–25.)

Unbeknownst to Marianna, entering the alarm code did not resolve the triggered alarm. Rather, it was the first step, after which the alarm monitoring company puts out a call to the Chastangs' landline and asks for a second access code. (Doc. 20-3, pp. 15–17.) But because Marianna went outside after she deactivated the alarm, she missed the call from the alarm company to check on the house. (Doc. 20-11, pp. 18–19.) Without fulfilling this second step, the alarm company notifies the police. (Doc. 20-3, 17:3–6.)

At that time, Deputy Levy was on duty. (Doc. 20-9, pp. 42–43.) The call about the Chastangs' alarm was dispatched as a general burglary alarm to another deputy, and

Deputy Levy responded. (*Id.*) Alone, he arrived at the residence at 6:03 p.m. and entered the property. (*Id.* at 43:5–6, 16–22.) He saw the lawn sign at the front of the driveway saying, "No Admittance Without Prior Authorization"—the sign had no meaning for him since he was authorized to enter as a law enforcement officer on duty responding to a call. (*Id.* at 47:11–25, 48:1–5.) When he saw the vehicle parked at the end of the driveway, Deputy Levy had the dispatcher call inside the home to check if someone was in the residence before approaching further. (*Id.* at 21:22–25, 22:1; *see also* Doc. 20-12, p. 6.) He was told no one answered (Doc. 20-12, p. 6), so he parked his patrol car and walked up the driveway (Doc. 20-9, p. 100:15–21). He reportedly didn't see either lawn sign at the end of the driveway, so was unaware that dogs may be on the premises when he approached the house. (*Id.* at 48–50, 99.)

Standard protocol dictated Deputy Levy check all doors. (*Id.* at 47:4.) Following this, he went first to the detached garage to check the door, and found it unlocked. (*Id.* at 47, 56–57.) He then radioed his finding of an unsecured door and started walking back toward the entryway. (Doc. 20-12, p. 6.) He saw a black dog—Pepper—running toward him from the back of the house. (*Id.*; Doc. 20-9, pp. 56–57.) Surprised at the dog's presence and approach, Deputy Levy took a step back in retreat, pulled out his service issued .45, and yelled, "Get back, get back!" (*See* Doc. 20-9, pp. 12–22, 119–120; Doc. 20-8, p. 25:17–18; *see also* Doc. 20-K.)[2] Pepper ran toward Deputy Levy, came near him, and then turned

---

[2] These facts are derived from Deputy Levy's body camera footage, which both parties attach as exhibits and submit is the best version of facts for the shooting. (*See* Docs. 20; 23, ¶ 3; 25, ¶ 8.) The Court refers to the body camera footage as "**Def. Ex. K**," which is how Deputy Levy submitted it.

and ran away from him, toward the center of the courtyard. (Def. Ex. K.) But she doubled back and made a circle, drawing closer to him. (*Id.*) The circle turned into a Figure-8, and as Pepper approached Deputy Levy, he kept his .45 trained on her. (*Id.*) While Pepper was circling, Bane came running from the back of the house, too, and he directly approached Deputy Levy. (*Id.*) At the sight of Bane, Deputy Levy retreated further toward the detached garage's wall. (*Id.*) He trained his gun on Bane; both dogs approached him closer, and Deputy Levy kept moving back. (*Id.*) In a matter of seconds, Deputy Levy was wedged between the garage and Marianna's black truck, and both dogs ran right up to him, between one and three feet away. (*Id.*; *see also* Doc. 20-9, p. 81:20–25.) Deputy Levy then fired two shots at the dogs. (Def. Ex. K.) The first one struck Bane in the snout, the second Pepper in the back as she turned away. (*Id.*) Bane and Pepper ran away, along with Kimbo who'd also emerged on scene but didn't approach Deputy Levy. (*Id.*)

Dogs gone, Deputy Levy walked away from the garage and car toward the front of the house. (*Id.*) He turned his body camera on,[3] began speaking to Deputy Martin, the other officer who arrived to assist, and walked out of the courtyard. (*Id.*; *see also* Doc. 20-

---

[3] The first thirty seconds of Deputy Levy's body camera recording have no audio. (Def. Ex. K.) This is a manufacturer design, which features a preset 30-second delay. (*See* Doc. 20-10, pp. 35:20–25, 36:1–5.) The camera operates by always recording, but not everything is captured. (*Id.* at 36:5–10.) Only when the camera is activated by the individual officer does audio recording start, yet the thirty seconds prior are also captured in the recording. (*See id.*) So once the camera is activated, it goes back thirty seconds to capture what just took place, without audio, but records with audio from the time of activation. (*See id.* at 36:11–25, 37:1–5.) Deputy Levy first activated his camera when walking toward Deputy Martin, after the shooting. (*See* Doc. 20-8, pp. 26–27.)

8, pp. 21–22, 27–29.) When he joined Deputy Martin, Deputy Levy radioed in about the shooting, saying "Three pitbulls just charged at me, I had to shoot them." (Def. Ex. K.) While the deputies were conferring, Marianna emerged from the backyard. (*Id.*) She heard the shots thinking they were firecrackers, but Bane then ran back to the pool and Marianna saw blood coming from his snout. (Doc. 20-11, pp. 23:20–25, 24–25, 29–30.) Walking up, she began speaking to the deputies across the courtyard and said something about the dogs. (Def. Ex. K.) Deputy Martin asked if she was the homeowner and Deputy Levy said, "They charged me, Ma'am, I didn't want to." Standing in the courtyard, Marianna began speaking very quickly. (*Id.*) Deputy Martin repeated his homeowner inquiry, and Deputy Levy asked if she could come closer to them. (*Id.*) She did and they all spoke. Deputy Levy apologized for shooting the dogs. Marianna explained how the home was her sister's and walked away to contact Patty. (*Id.*)

After this initial interaction, additional police showed up on scene. (Doc. 20-8, pp. 33–34.) Christian then drove in, followed soon by Lawrence, Jr. (Doc. 20-6, pp. 18–25.) Lawrence, Jr. found Bane and took him to an emergency animal hospital. (Doc. 20-4, pp. 57–60.) Christian began searching for Pepper, who ran away after getting shot. (Doc. 20-6, pp. 24:22–25, 25:1–4.) When Winston, Lawrence, Sr., and Patty arrived, they all aided Christian. (*Id.* at 26; *see also* Docs. 20-3, p. 20:8–12; 20-7, p. 18.) After several hours, Lawrence, Sr. and Christian found her. (Doc. 20-6, pp. 26–27.) Lawrence, Jr. had returned home and he and Christian took Pepper to the same hospital as Bane. (*Id.* at 27:10–15.)

At the emergency animal hospital, Pepper got X-rays and the vet pronounced she'd make close to a full physical recovery. (*Id.* at 28:7–20.) Pepper returned to the family

home with Christian later that night. (Doc. 20-4, pp. 69:19–23.) Bane's initial prognosis was similarly positive, but it changed once Lawrence, Jr. returned with Pepper. (*Id.* at 60–62.) Ultimately, to ease his suffering, Lawrence. Jr. made the decision to euthanize Bane. (*Id.* at 65–66) Lawrence, Jr. stayed with Bane while it happened, and took his body back to bury him in the family plot. (*Id.* at 66–67.)

### E.    This Action

Following the shooting, the family initiated this action against Deputy Levy in his individual capacity under 42 U.S.C. § 1983. (Doc. 1; *see also* Doc. 11, ¶¶ 22–27.) They claim that shooting Bane and Pepper constituted an unreasonable seizure in violation of the Fourth Amendment, and seek damages accordingly. (Doc. 11.) With summary judgment briefing complete (Docs. 20, 23, 24, 25), the matter is ripe.

### II.    LEGAL STANDARDS

Summary judgment is appropriate only if the movant shows that there is no genuine dispute as to any material fact and that [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). As to issues for which the movant would bear the burden of proof at trial, it must affirmatively show the absence of a genuine issue of material fact and support its motion with credible evidence demonstrating that no reasonable jury could find for the nonmoving party on all of the essential elements of its case. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (citing *United States v. Four Parcels of Real Prop. in Green & Tuscaloosa Ctys*, 941, F.2d 1428, 1438 (11th Cir. 1991)).

As to issues for which the nonmovant would bear the burden of proof at trial, the movant has two options: (1) it may simply point out an absence of evidence to support the nonmoving party's case; or (2) it may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Four Parcels*, 941 F.2d at 1438 (citing *Celotex Corp.*, 477 U.S. at 325). "The burden then shifts to the nonmoving party, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick*, 2 F.3d at 1115–17).

"A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the nonmovant, *Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006), such that "when conflict arises between the facts evidenced by the parties, [the] court credit[s] the nonmoving party's version," *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005). However, "[the] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the nonmovant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

# III.    DISCUSSION

## A.    Fourth Amendment Framework[4]

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. This language protects two "types of expectations": "searches" and "seizures." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *Id.* Destroying property may constitute a "seizure" if the destruction was "unreasonable" under the circumstances. *See id.* at 124–25; *see also United States v. Place*, 462 U.S. 696, 705–09 (1983) (assessing the reasonableness of luggage seizure when police acted on reasonable suspicion, not probable cause).

The "reasonableness of a particular seizure depends not only on *when* it is made, but also *how* it is carried out." *Graham v. Connor*, 490 U.S. 386, 396 (1989). This determination "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* (citing *Tennessee v. Garner*, 417 U.S. 1, 8 (1985), quoting *Place*, 462

---

[4] Plaintiffs' Fourth Amendment claims are brought pursuant to 42 U.S.C. § 1983, which provides a cause of action for constitutional violations committed under color of state law. (*See* Doc. 11.) To prevail, Plaintiffs must demonstrate: (1) that Deputy Levy deprived them of a right secured under the Fourth Amendment; and (2) that deprivation occurred under color of state law. *See Reyes v. Maschmeier*, 446 F.3d 1199, 1202 (11th Cir. 2006); *see also Arrington v. Cobb Cty.*, 139 F.3d 865, 872 (11th Cir. 1998).

U.S. at 703). It turns on "the facts and circumstances of each particular case," which includes whether "an immediate threat to the safety of the officer[]" is posed. *See id.* What is more, the "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)). This "calculus" "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. Where, as here, the seizure is claimed to be unreasonable for employing excessive force, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *See id.* at 397.

To seek relief for an unreasonable seizure, a person must have a cognizable Fourth Amendment interest in the item seized. *See Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018). This is because "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133 (1978) (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)). And this analysis of whose possessory rights were violated by a challenged seizure is another part of "substantive Fourth Amendment doctrine." *See id.* at 140. Sometimes called "Fourth Amendment standing," this inquiry "should not be confused with Article III standing, which is jurisdictional and must be assessed before reaching the merits." *Byrd*, 138 S. Ct. at 1530 (citing *Az. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 129 (2011)); *see also*

*Minnesota v. Carter*, 525 U.S. 83, 87 (1998) (expressly rejecting treating Fourth Amendment standing like Article III standing). As such, "Fourth Amendment standing . . . need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim." *Byrd*, 138 S. Ct. 1530. "[I]n its discretion," therefore, a court may first assess the reasonableness of the seizure. *See id.* at 1530–31; *see also Presley v. United States*, 895 F.3d 1284, at III.A. (11th Cir. 2018) (declining to decide whether the plaintiffs had "Fourth Amendment standing" and instead assessing reasonableness of the plaintiffs' expectation of privacy and IRS's summonses).

## B.      Summary Judgment Motions

At first blush, Deputy Levy argues that not all members of the Chastang family have adequate possessory interests in Bane and Pepper to bring their Fourth Amendment claims—which he classifies as a jurisdictional standing issue that the Court must decide before analyzing the reasonableness of the seizure. (Doc. 20, pp. 8–13.) Interestingly, Plaintiffs "agree" that deciding who owned Bane and Pepper is a "threshold jurisdictional question," and argue that each Chastang has "standing to litigate a claim for the unreasonable seizure of the family dogs." (Doc. 24, p. 2; *see also id.* at 2–8.) Clearly, both sides got mired in "Fourth Amendment standing" and "Article III standing," but the Court will not join them in the bog. Instead, the Court exercises its discretion to first analyze the reasonableness of the challenged seizure—the heart of these summary judgment motions.[5] (Docs. 20, 23); *see Byrd*, 138 S. Ct. at 1530–31; *Presley*, 895 F.3d at III.A.

---

[5] Under the qualified immunity lens, Deputy Levy argues that his actions were objectively reasonable and no seizure occurred when he shot Bane and Pepper. (Doc. 20,

Pets are "effects" subject to Fourth Amendment protection. *See Altman v. City of High Point, N.C.*, 330 F.3d 194, 202–04 (4th Cir. 2003). A police officer's shooting of a pet dog, therefore, may constitute a seizure under the Fourth Amendment if it was objectively unreasonable in light of the facts and circumstances. *See id.* at 205. (citing *Graham*, 490 U.S. at 396–97).[6] Here, the question is whether a reasonable officer in Deputy Levy's position would have believed Bane and Pepper posed an imminent threat to his safety to justify shooting them. *See id.* at 205–07; *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 210–11 (3d. Cir. 2001) ("[T]he state's interest in protecting life and property may be

---

pp. 13–15.) In response, without addressing qualified immunity, Plaintiffs argue that an unreasonable seizure occurred because under those circumstances, it was unreasonable to shoot the dogs. (Doc. 24.) Plaintiffs repeat this argument in their partial motion for summary judgment (Doc. 23), which Deputy Levy responds to with largely the same argument advanced in his motion for summary judgment—his actions were reasonable (Doc. 25). Thus, the focus at summary judgment is whether Deputy Levy's conduct amounted to a Fourth Amendment violation, so the Court analyzes this without reference to qualified immunity—even though such analysis is essentially the first prong of qualified immunity, which asks whether a constitutional violation occurred. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *cf. Brown v. Muhlenberg Twp.*, 269 F.3d 205, 210–11 (3d. Cir. 2001) (analyzing whether an unreasonable seizure occurred when officer shot dog before turning to qualified immunity defense). As the Court finds no constitutional violation occurred, *see infra* pp. 17–19, Deputy Levy would be entitled to qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (qualified immunity provides "that government officials performing discretionay functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known").

 [6] *See, e.g.*, *Villo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008) ("Every circuit that has considered the issue has held that the killing of a companion dog constitutes a 'seizure' within the meaning of the Fourth Amendment."); *Andrews v. City of West Branch*, 454 F.3d 914, 918 (8th Cir. 2006) ("[A]n officer commits an unreasonable, warrantless seizure of property, in violation of the Constitution, when he shoots and kills an individual's family pet when the pet presented no danger and when non-lethal methods of capture would have been successful."); *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 975 (9th Cir.), *cert. denied*, 546 U.S. 1061 (2005); *Altman*, 330 F.3d at 204–05; *Brown*, 269 F.3d at 209–11; *Maldonado v. Fontanes*, 568 F.3d 263, 271 (1st Cir. 2009).

implicated when there is reason to believe the pet poses an imminent danger . . . [which] may even justify the extreme intrusion occasioned by the destruction of the pet . . . .").[7] The record evidence undisputedly answers this question yes.[8] The only reason Deputy Levy came to the Chastangs' family home was in response to a triggered burglar alarm. After arriving and seeing a vehicle, Deputy Levy had dispatch attempt to call the family home before proceeding. No one answered, so he proceeded up the driveway to the house to assess whether a burglary occurred. After finding an unsecured door in the detached garage, Deputy Levy radioed his back-up. He turned around to walk away from the home, when he suddenly saw a dog, Pepper, running in his direction—shown by his body camera. In a matter of seconds: Pepper approached him; he yelled, "Get back, get back!" and retreated several steps; Pepper made a circle coming back to him; he backed up further, and he saw another dog, Bane, approaching him. At this point, Deputy Levy's gun was drawn but not fired. At the sight of Bane, Deputy Levy kept backing up until he was wedged between the garage and truck. Bane ran directly toward him, and Pepper joined. Only when both dogs were immediately in front of him did Deputy Levy fire his

---

[7] *See also, e.g., Grant v. City of Houston*, 625 F. App'x 670, 674–78 (5th Cir. 2018) (analyzing whether dog posed a threat to officer's safety to determine whether shooting it was reasonable); *Patino v. Las Vegas Metro. Police Dep't.*, 706 F. App'x 427, 427–28 (9th Cir. 2017) (same); *Stephenson v. McClelland*, 632 F. App'x 177, 184–85 (5th Cir. 2015) (same); *Esterson v. Broward Cty. Sheriff's Dep't*, No. 09-60280-CIV, 2010 WL 4614725, at *3–4 (S.D. Fla. Nov. 4, 2010) (same).

[8] Again, the Court relies chiefly on the body camera footage, which both parties agree is the best evidence for what occurred on July 2, 2016. (Docs. 20, 23, ¶ 3, 25 ¶ 8); *see Mathis v. Adams*, 577 F. App'x 966, 968 (11th Cir. 2014) ("In light of the uncontroverted video evidence, the district court [is] required to view the facts in the light depicted by the video even if [the plaintiff's] allegations contradicted its depiction.").

weapon. He fired twice, and both dogs ran away. He did not fire at the third Rottweiler, Kimbo.

Under these circumstances, the Court finds that Deputy Levy's actions defending himself were objectively reasonable, as a reasonable officer in his position would have perceived an imminent threat to his personal safety when Bane and Pepper were directly in front of him. *See Graham*, 490 U.S. at 396–97; *Altman*, 330 F.3d at 197–98; *Grant*, 625 F. App'x at 677. This was a tense, evolving, unpredictable situation where Deputy Levy made a split-second judgment call about the use of force necessary to combat the threat. *See Graham*, 490 U.S. at 397. Notably, Deputy Levy's immediate reaction on seeing a dog advancing was not to shoot, but to yell and back up. He retreated until he was cornered, and even then did not fire. Only when he perceived immediate danger did he pull the trigger, out of concern for his safety. This action was assuredly reasonable, and his failure to use non-lethal means does not alter the calculus. *See Patino v. Las Vegas Metro Police Dep't*, 207 F. Supp. 3d 1158, 1164–65 (D. Nev. 2016), *aff'd* 706 F. App'x 427 (9th Cir. 2017) (finding police officer's conduct "objectively reasonable under the totality of the circumstances" when he entered property to respond to emergency, pitbull began running toward him, officer yelled at dog to stop and when dog came within two feet of officer, he shot).

Plaintiffs submit that a reasonable officer in this situation would've seen the lawn sign alerting the presence of dogs, and thus not been so surprised to draw a gun. (Docs. 23, pp. 7–9; 24, pp. 8–9.) This is neither here nor there, as accepting their claim that a reasonable officer could see the third sign does not beget a different outcome. Sheer

surprise at Pepper's presence did not elicit Deputy Levy's shooting response; rather, he shot only when: his yells didn't work; he couldn't retreat further; and, most importantly, the two dogs came directly in front of him. At this point—despite Plaintiff's contentions that the dogs posed no clear and imminent danger to Deputy Levy—it is reasonable for an officer to feel threatened and react by shooting. These dogs were not languidly curious, trying to sniff out a new presence. Rather, they ran menacingly toward the unknown presence and, in a combined assault, advanced directly at it. At that moment, Bane and Pepper showed no signs of breaking off their attack or calming. To react by shooting them was objectively reasonable.

Finally, Plaintiffs maintain that non-lethal force should have been used instead. (*See* Docs. 23, pp. 7–12; 24, pp. 10–14.) This argument does not carry the day. Although lethal force may not have been the *best possible* response, that is not the test—reasonableness is. *See Altman*, 330 F.3d at 207. ("It is important to note that we are not saying the officers' responses in these cases were the best possible responses. We are only saying that, under the circumstances existing at the time the officers took the actions and in light of the facts known by the officers, their actions were objectively reasonable.") As the *Altman* court said, "[i]n retrospect, it may have been preference if the officers attempted first to use nonlethal force in every instance. Such nonlethal force may have been successful, but tellingly, it may not have been." *See* 330 F.3d at 207. Indeed, the Court cannot operate "with the 20/20 vision of hindsight." *See Graham*, 490 U.S. at 396. So, in assessing whether Deputy Levy meets the reasonableness test here, the Court resoundingly finds he does.

Having found Deputy Levy's actions reasonable, the Court has no basis to find a constitutional violation occurred here. Thus, Plaintiffs' Fourth Amendment claims fail, and summary judgment is due to be granted to Deputy Levy and denied for Plaintiffs.

## IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant Gilad Levy's Motion for Summary Judgment (Doc. 20) is **GRANTED**.

2. Plaintiffs Lawrence J. Chastang, Dora Patricia Chastang, Lawrence Chastang, Jr., Miles Christian Chastang, Adriana Patricia Chastang, and Winston Chastang's Motion for Partial Summary Judgment (Doc. 23) is **DENIED**.

3. The Clerk is **DIRECTED** to:

   a. Enter judgment in favor of Defendant Gilad Levy and against Plaintiffs Lawrence J. Chastang, Dora Patricia Chastang, Lawrence Chastang, Jr., Miles Christian Chastang, Adriana Patricia Chastang, and Winston Chastang;

   b. Terminate any other pending motions and deadlines; and

   c. Close the file.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on August 13, 2018.



ROY B. DALTON JR.
United States District Judge

Copies to:
Counsel of Record